# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tonia M. M.,                                    Case No. 20-cv-774 (TNL)

      Plaintiff,

v.                                              **ORDER**

Kilolo Kijakazi,
Acting Commissioner of Social Security,[1]

      Defendant.

Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue South, #890, Minneapolis, MN 55401 (for Plaintiff); and

Michael Moss, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Tonia M. M. brings the present case, contesting Defendant Commissioner of Social Security's termination of disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

This matter is before the Court on the parties' cross-motions for summary judgment. ECF Nos. 23, 25. For the reasons set forth below, Plaintiff's motion is denied and the Commissioner's motion is granted.

---

[1] The Court has substituted Acting Commissioner Kilolo Kijakazi for Andrew Saul. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

## II. PROCEDURAL HISTORY

Plaintiff was previously found disabled as of August 2002, due to her affective/mood and back disorders.  Tr. 10, 58.  A claimant's "continued entitlement to [disability] benefits must be reviewed periodically."  20 C.F.R. § 404.1594(a); *see* 20 C.F.R. § 404.1589 ("After we find that you are disabled, we must evaluate your impairment(s) from time to time to determine if you are still eligible for disability cash benefits.").  This evaluation process is known as continuing disability review, or "CDR." 20 C.F.R. § 404.1589.  In June 2017, following a continuing disability review, Plaintiff was determined to no longer be disabled.  Tr. 10, 74-75.  This determination was upheld upon reconsideration by a disability hearing officer.  Tr. 10, 85-101.

Plaintiff requested a hearing before an administrative law judge ("ALJ").  Tr. 10, 106.  The ALJ held a hearing on October 11, 2018.  Tr. 10, 38.  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied her request for review.  Tr. 1, 10-21.  Plaintiff then filed the instant action, challenging the ALJ's decision.  Compl., ECF No. 1.  The parties have filed cross motions for summary judgment.  ECF Nos. 23, 25.  This matter is now fully briefed and ready for a determination on the papers.

## III. ANALYSIS

### A.  Legal Standard

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high."  *Id.*  "It means—and means

only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) ("Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision.").

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher*, 652 F.3d at 863. The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Id.*; *accord Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

### B. Continuing Disability Review & Medical Improvement

"When benefits have been denied based on a determination that a claimant's disability has ceased, the issue is whether the claimant's medical impairments have improved to the point where [s]he is able to perform substantial gainful activity." *Delph v. Astrue*, 538 F.3d 940, 945 (8th Cir. 2008) (citing 42 U.S.C. § 423(f)(1)); *see Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) ("To discontinue a claimant's benefits because his or her medical condition has improved, the Commissioner must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that

3

the improvement in the physical condition is related to [the] claimant's ability to work." (quotation omitted)). "This 'medical-improvement' standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits." *Delph*, 538 F.3d at 945; *accord Koch v. Kijakazi*, 4 F.4th 656, 663-64 (8th Cir. 2021); *see* 20 C.F.R. § 404.1594(b)(1), (c)(1).

Continuing disability review is also a sequential evaluation process. *Dixon v. Barnhart*, 324 F.3d 997, 1000 (8th Cir. 2003); *accord Koch*, 4 F.4th at 664; *see* 20 C.F.R. § 404.1594(f).

> The regulations for determining whether a claimant's disability has ceased may involve up to eight steps in which the Commissioner must determine (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of h[er] past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

*Dixon*, 324 F.3d at 1000-01 (citing 20 C.F.R. § 404.1594(f)).

4

Generally speaking, "the claimant bears the initial burden to demonstrate that she is disabled." *Koch*, 4 F.4th at 663; *see* 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). With respect to the termination of benefits based on medical improvement, however, "the burden shift[s] to the Commissioner . . . to show that [the claimant] is no longer disabled based on medical improvement." *Koch*, 4 F.4th at 663 (citing *Muncy*, 247 F.3d at 734).

### C. Decision Under Review

Plaintiff "concedes that her medical condition has improved but contends the improvement has not been sufficient to allow her to work," Pl.'s Mem. at 1, ECF No. 24; *see* Pl.'s Mem. at 11, challenging the ALJ's determination of her residual functional capacity.

The ALJ determined that Plaintiff has the residual functional capacity to perform light work[2] with the following pertinent additional limitations:

> occasionally bending, stopping, crouching[,] climbing ramps, stairs and ladders, and reaching overhead[; and] cannot work at unprotected heights or around dangerous, exposed moving machinery.

Tr. 15.[3] In reaching this determination, the ALJ considered Plaintiff's own description of her symptoms; the testimony of Plaintiff, her husband, her son, and a friend before the

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

[3] The ALJ also limited Plaintiff to "routine, repetitive 3-4 step work, and brief, infrequent and superficial contact with coworkers, the public and supervisors." Tr. 15. Plaintiff's arguments, however, focus on her physical impairments, symptoms, and limitations. *See, e.g.*, Pl.'s Mem. at 3 ("Recent medical records document that [Plaintiff] continued to suffer with physical impairments."); *see also* Pl.'s Mem. at 3-6 (discussing medical records, opinions, and testimony related to physical impairments, symptoms, and limitations).

disability hearing officer; the medical evidence; and Plaintiff's daily activities.  Tr. 16-19.

The ALJ also considered opinion evidence from Joseph C. Horozaniecki, MD, the

impartial medical expert who testified at the hearing before the ALJ; Julie Ann Van Eck,

MD, Plaintiff's primary care physician; and the state agency medical consultants.  Tr. 19.

### D. Residual Functional Capacity

Plaintiff asserts that the ALJ "failed to accord the proper weight to the opinion of

[her] treating physician," Dr. Van Eck, and, as a result, the ALJ's residual-functional-

capacity determination "is not supported by substantial evidence on the record as a

whole."  Pl.'s Mem. at 11.

A claimant's "residual functional capacity is the most [she] can still do despite

[her] limitations."  20 C.F.R. § 404.1545(a)(1); *accord Kraus v. Saul*, 988 F.3d 1019,

1022 (8th Cir. 2021); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A

claimant's [residual functional capacity] represents the most he can do despite the

combined effects of all of his credible limitations and must be based on all credible

evidence.").  "Because a claimant's [residual functional capacity] is a medical question,

an ALJ's assessment of it must be supported by some medical evidence of the claimant's

ability to function in the workplace."  *Perks*, 687 F.3d at 1092 (quotation omitted).

"Medical records, physician observations, and the claimant's subjective statements about

h[er] capabilities may be used to support the [residual functional capacity]."  *Id.*; *see also*

*Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013)  ("The Commissioner must determine

a claimant's [residual functional capacity] based on all of the relevant evidence, including

the medical records, observations of treating physicians and others, and an individual's

own description of [his] limitations."). "Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *see* 20 C.F.R. § 404.1546(c). And, "[a]lthough it is the ALJ's responsibility to determine the claimant's [residual functional capacity], 20 C.F.R. §§ 404.1545(a); 404.1546(c), the burden is on the claimant to establish his or her [residual functional capacity]." *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016).

### 1. Medical Evidence

It is undisputed that Dr. Van Eck is Plaintiff's primary care physician and has treated Plaintiff since at least 2002. *See, e.g.*, Tr. 343-44. Among other things, Dr. Van Eck regularly treated Plaintiff for complaints of back pain. *See, e.g.*, Tr. 462-66, 533-35, 540-44. In 2008, Plaintiff "underwent anterior/posterior fusion at L5-S1." Tr. 436; *see also, e.g.*, Tr. 456, 707. Dr. Van Eck has prescribed morphine for pain management since at least April 2016. *See, e.g.*, Tr. 470; *see also, e.g.*, Tr. 463. Since at least March 2017, Dr. Van Eck has diagnosed Plaintiff with "[c]hronic low back pain with sciatica."[4] *See, e.g.*, Tr. 543, 535, 595, 613, 630, 634, 694, 728, 737, 768, 776, 804, 808.

---

[4]

> Sciatica is a symptom of a problem with the sciatic nerve, the largest nerve in the body. It controls muscles in the back of your knee and lower leg and provides feeling to the back of your thigh, part of your lower leg, and the sole of your foot. When you have sciatica, you have pain, weakness, numbness, or tingling. It can start in the lower back and extend down your leg to your calf, foot, or even your toes. It's usually on only one side of your body.

*Sciatica*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/sciatica.html (last accessed Sept. 28, 2020).

### a.   2017

Plaintiff saw Dr. Van Eck for a follow-up appointment at the end of January 2017. Tr. 459-61.  Dr. Van Eck noted that Plaintiff "walk[ed] with a normal gait."  Tr. 461.  Dr. Van Eck also noted Plaintiff was "trying to wean down on her morphine use" and had "an entire script for morphine that she has not used."  Tr. 460.

At an initial physical therapy evaluation in early February, Plaintiff was noted to have an impaired gait.  Tr. 456.  It was also noted that she was not using an assistive device for walking.  Tr. 456.

Approximately one week later, Plaintiff went to a spine clinic for complaints of "neck pain and arm numbness, as well as low back pain."  Tr. 436; *accord* Tr. 496, 662. Upon examination, Plaintiff was "very tender to palpation into both trapezius muscles and into the subacromial space of both shoulders."  Tr. 438; *accord* Tr. 498, 664. Plaintiff had "bilateral impingement signs of both shoulders, right greater than left."  Tr. 438; *accord* Tr. 498, 664.  Plaintiff was "also tender to palpation throughout much of the paraspinal region in the lower lumbar spine and into the sacroiliac joints."  Tr. 438; *accord* Tr. 498, 664.  Plaintiff "did have a positive Tinel's on the left wrist and positive Phalen's on the left, which caused numbness and tingling of the left 5th finger," as well as "positive Tinel's on both elbows."  Tr. 438; *accord* Tr. 498, 664.

At the same time, it was also noted that Plaintiff "walk[ed] with a normal gait" and "can toe and heel walk and perform tandem gait without problem."  Tr. 438; *accord* Tr. 498, 664.  Plaintiff had "[n]ormal cervical range of motion" and her "[l]umbar range of motion [wa]s slightly limited in all planes secondary to pain."  Tr. 438; *accord* Tr. 498,

8

664.  Plaintiff's motor strength was "5/5 in both upper and lower extremities throughout."  Tr. 438; *accord* Tr. 498, 664.

Imaging showed that Plaintiff's "fusion at L5-S1 appear[ed] to be solid."  Tr. 438.  She had "slight retrolisthesis of L4 on L5" and "retrolisthesis of C4 on C5."  Tr. 438; *accord* Tr. 666.  "Mild spondylitic [sic] changes" were also observed.  Tr. 438; *accord* Tr. 666.  A follow-up EMG of Plaintiff's upper extremities was "normal" with "no evidence of any obvious radiculopathy, plexopathy, neuropathy, or polyneuropathy affecting the right or left upper extremities."  Tr. 501; *accord* Tr. 671; *see* Tr. 502-04, 681-88.

MRIs were conducted on Plaintiff's cervical and lumbar spine in April.  Tr. 517-20, 677-80.  Plaintiff's cervical spine showed "[d]egenerative changes at C4-C5 and C5-C6," which "ha[d] increased slightly" compared to a prior 2005 scan.  Tr. 518; *accord* Tr. 678.  As for Plaintiff's lumbar spine, the "[p]reviously seen central disc protrusion/extrusion at L4-L5 ha[d] almost completely resolved" and there was "no impingement on neural structures at this level."  Tr. 520; *accord* Tr. 680.

In mid-September, Plaintiff saw Dr. Van Eck in connection with a request for a letter in support of her Social Security benefits.  Tr. 594.  Plaintiff reported continued back pain and Dr. Van Eck noted that she was "[w]alking slowly with [a] bent over antalgic gait."  Tr. 595.  Dr. Van Eck provided Plaintiff with the letter.  Tr. 595; *see* Tr. 522-25.

At an initial physical therapy evaluation at the end of October, Plaintiff was noted to have an impaired gait and was not using any assistive device for walking.  Tr. 591-92.

9

In early November, Plaintiff was seen by Dr. Van Eck with complaints of pain in her right arm "so painful she 'just wants to rip it off.'"  Tr. 632.  Plaintiff had "pain in [her] neck[ and] shoulders[ and] down both arms."  Tr. 632.  The pain was worse on the right compared to the left.  Tr. 632.  It also traveled "to [Plaintiff's] hands, first 3 fingers, occasionally 4th and 5th."  Tr. 632; *see* Tr. 633 ("She has individual digits that will shake, a tremor.  Usually the middle one.  She gets electric shocks in hands and arms. Every day.")  Dr. Van Eck noted that Plaintiff "refuses to use a cane, but may need one," and that her "EMG in March was normal."  Tr. 633.  Plaintiff was "interested in getting a neck injection" and having "the hardware" removed from her lower back.  Tr. 633.

Upon examination, Plaintiff had a normal gait.  Tr. 634.  She had "tenderness to palpation of [her] back"; "good range of motion at [her] waist"; and "good strength and sensation" in her "lower extremities."  Tr. 634.  Dr. Van Eck additionally noted: "Neck with good range of motion, normal strength, fine tremor at rest and motion of middle left digit."  Tr. 634.  Dr. Van Eck instructed Plaintiff to schedule the injection and prescribed gabapentin.[5]  Tr. 635.

When Plaintiff saw Dr. Van Eck in connection with her mental health in mid-December, she was experiencing "incredible anxiety" due to financial concerns and the anniversary of the death of a family member.  Tr. 639.  Plaintiff's "pain [wa]s making everything worse."  Tr. 639.  Plaintiff reported that "[s]he has seen several surgeons and specialists for her back pain but she wa[s] told she was not a surgical candidate . . . as she

---

[5] Gabapentin is used in the treatment of neuralgia, "a sharp, shocking pain that follows the path of a nerve and is due to irritation or damage to the nerve."  *Neuralgia*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus. gov/ency/article/001407.htm (last accessed Sept. 28, 2021); *see Gabapentin*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a694007 html (last accessed Sept. 28, 2021).

has extensive arthritis." Tr. 639. Plaintiff tried physical therapy, "but cannot make a lot of appointments due to time and money." Tr. 639. Plaintiff reported that gabapentin "is the only thin[g] that makes her feel okay." Tr. 639. Plaintiff also stated that "[s]he knows that she has to take her Maxalt[6] within 5 minutes of her aura, or she [w]ill have a migraine for 3 days." Tr. 640. Upon examination, Plaintiff was noted to have a "[s]tooped, shuffling gait." Tr. 642.

### b.   2018

Plaintiff had a telephone visit with Dr. Van Eck in early January 2018. Tr. 694. Plaintiff reported that gabapentin was "helping greatly with the pain of her back and neck." Tr. 695. Plaintiff also reported "almost" going to the hospital for a migraine. Tr. 695. Plaintiff experienced "electric shocks in her arms and legs" that were "very bothersome." Tr. 695. Dr. Van Eck increased the gabapentin. Tr. 696.

In early February, Plaintiff was seen by Richard M. Belle Isle, MD, for a pain management consultation. Tr. 707. Plaintiff had "complain[ts] of neck pain with pain that travels into the shoulders and down her arms into the hands, sometimes with numbness in the last two fingers, other times in the first 3 fingers on both hands, but more on the right." Tr. 707. Plaintiff experienced "numbness . . . all the way down her arms but the pain in the arms [wa]s intermittent shooting pains." Tr. 707. Plaintiff "state[d] that her arms will occasionally 'go out' on her but denie[d] specific weakness." Tr. 707. Plaintiff's "neck pain varie[d] in intensity" with "good and bad days." Tr. 707. Plaintiff

---

[6] Maxalt is a brand name for rizatriptan and "used to treat the symptoms of migraine headaches (severe, throbbing headaches that sometimes are accompanied by nausea and sensitivity to sound and light)." *Rizatriptan*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a601109.html (last accessed Sept. 28, 2021).

also had "constant, left greater than right lower back pain with intermittent pain into the buttocks, mostly on the left."  Tr. 707.  Plaintiff did not have numbness, tingling, or weakness in her legs.  Tr. 707.  Plaintiff's back pain was "essentially [the] same as at the time of surgery except for the current lack of lower extremity pain."  Tr. 708.  Plaintiff "fe[lt] that her lumbar fusion instrumentation [wa]s a cause of her lower back pain."  Tr. 708.

Upon examination, Dr. Belle Isle noted that Plaintiff was "very pain focused" and had "exaggerated or magnified responses to examination."  Tr. 716; *see, e.g.*, Tr. 711 ("patient resists examination of the lumbar spine complaining of severe pain with palpation"), ("reactions to examination are exaggerated"), ("very exaggerated gait pattern").  Dr. Belle Isle noted that Plaintiff did "have some degenerative changes in her cervical spine with foraminal narrowing worse on the right at C4-5 and C5-6 that is likely contributing to her neck and upper extremity symptoms."  Tr. 716.  Plaintiff's "lumbar fusion [wa]s stable and there [wa]s no significant findings on the lumbar MRI but [Plaintiff's] examination [wa]s suggestive of facet joint related pain above her fusion."  Tr. 716.  Dr. Belle Isle was "reluctant to perform injections due to [Plaintiff's] response to examination," but would proceed if Plaintiff elected to do so.  Tr. 716.

Roughly one week later, Plaintiff followed up with Dr. Van Eck.  Tr. 728.  Plaintiff had a negative reaction to her visit with Dr. Belle Isle and told Dr. Van Eck that Dr. Belle Isle "didn't want to do injections as she wouldn't be able to handle it."  Tr. 731.

Plaintiff returned to the spine clinic in early March with "ongoing lower back problems."  Tr. 672.  Upon examination, Plaintiff had "tenderness in the lumbar spine

over the instrumentation bilaterally" as well as "some tenderness more proximally."  Tr. 673.  Plaintiff was "otherwise intact neurologically."  Tr. 673.  Notes from the visit indicate that some of Plaintiff's pain "certainly could be coming from the L4-5 disc where there is some degeneration noted" per the April 2017 MRI.  Tr. 673.  Plaintiff's "instrumentation" could also "be the source of some of her pain" given the tenderness in the area.  Tr. 673.  It was recommended that Plaintiff try "bilateral trigger point injections or [sic] the pedicle screw heads at L5 and S1."  Tr. 673.

Plaintiff next saw Dr. Van Eck in mid-April.  Tr. 737.  Plaintiff had complaints of joint pain in her shoulders, arms, neck, hands, and skull, which were helped by ice and gabapentin.  Tr. 737.  Plaintiff's chronic back pain was better with morphine, "allow[ing] her to be more active."  Tr. 739.  Plaintiff was also experiencing a "bad migraine."  Tr. 739.  Upon examination, Plaintiff's neck had "good range of motion"; there was "no pain along the spine"; her "paraspinal muscles [we]re tight, spastic and tender"; "Spurling's [wa]s negative"; she had "decreased strength in [her] right arm mainly with grip strength and biceps"; and there was "[n]o synovitis noted of any joints."  Tr. 740.  Dr. Van Eck increased the gabapentin dose again and recommended Plaintiff "[s]ee Dr[.] Belle Isle as planned."  Tr. 741.

Plaintiff returned to Dr. Belle Isle in early May.  Tr. 757.  Plaintiff continued to report pain in her neck, shoulders, and lower back.  Tr. 759.  Upon examination, Plaintiff's neck had full range of motion; her extremities were normal and she was "able to move about the exam room without difficulty."  Tr. 762.  Plaintiff's gait was normal and "toe and heel walk intact."  Tr. 762.  Plaintiff was "[m]oving all extremities

spontaneously" with "no apparent weakness." Tr. 792. As for Plaintiff's cervical spine, Dr. Belle Isle observed: "Mildly decreased range of motion on lateral rotation to the right, tenderness along the right paraspinal muscles and articular pillars, palpable spasm in the paraspinal muscles and trapezius muscle on the right, facet loading is negative." Tr. 762. As for Plaintiff's lumbar spine, Dr. Belle Isle observed: "Tender at the SI joints, right greater than left and lumbar paraspinal muscles, flexes greater than 90 degrees – decreased effort, facet loading is equivocal, straight leg raise is negative bilaterally, FABER is equivocal bilaterally, right more than left." Tr. 762. Dr. Belle Isle recommended that Plaintiff continue with physical therapy and her current medications as well as schedule a cervical injection and lumbar trigger point injections. Tr. 764.

During a follow-up appointment with Dr. Van Eck in early October, Plaintiff was noted to be sitting in a wheel chair. Tr. 812.

### 2. Dr. Van Eck

#### a. Dr. Van Eck's Opinion

Dr. Van Eck completed an opinion form regarding Plaintiff's ability to do work-related activities. Tr. 684-87. Dr. Van Eck opined that Plaintiff could: lift and carry less than 10 pounds on both a frequent and occasional basis; stand and walk for less than 2 hours in an 8-hour day; and sit for approximately 4 hours in an 8-hour day. Tr. 684. Dr. Van Eck opined that Plaintiff could sit 10 minutes and stand 5 minutes before needing to change positions. Tr. 684-85. Plaintiff needed to walk around for 10 minutes every 10 minutes and also required the ability to shift positions at will. Tr. 685. Further, Plaintiff needed to lie down "frequently." Tr. 685. Dr. Van Eck explained that Plaintiff had a

spinal fusion and the "titanium screws have loosened," causing "pain in [the] area requiring chronic narcotics."  Tr. 685.  Dr. Van Eck also stated that Plaintiff "has degenerative disc disease of both [her] low back and cervical spine."  Tr. 685.

As for Plaintiff's postural limitations, Dr. Van Eck opined that Plaintiff could occasionally "twist with pain but not fully" and could occasionally "climb 8-10 stairs slowly."  Tr. 685.  Plaintiff could not stoop, crouch, or climb ladders.  Tr. 685.

As for Plaintiff's use of her upper extremities, Dr. Van Eck opined that Plaintiff's abilities to reach, handle, finger, feel, and push/pull were all affected.  Tr. 686.  Dr. Van Eck stated that reaching causes "pulling & stabbing pain"; the abilities to handle, finger, and feel were affected by Plaintiff's neuropathy, which caused some "numbness in [her] hands"; and Plaintiff was "unable to push, pull greater than 5-10 lbs due to pain."  Tr. 686.  Dr. Van Eck cited the "MRI and CT scans of [Plaintiff's] neck and low back" as the medical findings supporting these limitations.  Tr. 686.

With respect to environmental limitations, Dr. Van Eck opined that Plaintiff had no restrictions for extreme heat and wetness; should avoid concentrated exposure to noise as well as fumes, odors, dusts, gases, poor ventilation, etc.; should avoid even moderate exposure to extreme cold and humidity; and should avoid all exposure to hazards, which included machinery and heights.  Tr. 686.  Dr. Van Eck explained that Plaintiff's pain was "exacerbated by cold and humidity" and noises could "exacerbate [Plaintiff's] migraine[s]."  Tr. 686.

As for any other work-related limitations, Dr. Van Eck opined that Plaintiff needed the assistance of a cane, walker, or wheelchair when walking; used a back brace,

TENS unit, and heat and ice; was unable to crawl and kneel; and had "difficulty balancing at times."  Tr. 687.  Dr. Van Eck further opined that Plaintiff's impairments and treatment would cause her to be absent from work more than three times per month. Tr. 687.

### b.    Weight Accorded to Dr. Van Eck

The ALJ gave "little weight" to Dr. Van Eck's opinion.  Tr. 19.  The ALJ found

> Dr. Van Eck's opinion . . . inconsistent with examination findings showing normal gait with no use of assistive devices, a normal EMG of the upper extremities, cervical MRI showing only mild to moderate degenerative changes, mildly decreased lumbar and cervical range of motion, and treatment notes indicating that [Plaintiff] has migraine headaches only infrequently.

Tr. 19.  Plaintiff asserts that the ALJ "failed to accord proper weight" to her treating physician.  Pl.'s Mem. at 11.

"Treating physicians are likely to be the medical professionals most able to provide a detailed, longitudinal picture of a claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone."  *Kraus*, 988 F.3d at 1024 (quotation omitted); *see* 20 C.F.R. § 404.1527(c)(2).[7]  "A treating physician's opinion is entitled to controlling

---

[7] Plaintiff asserts § 404.1527 applies to the evaluation of medical opinions.  Pl.'s Mem. at 14 n.2.  The Commissioner has cited to § 404.1527 without discussion.  *See, e.g.*, Comm'r's Mem. at 9, ECF No. 26.  The ALJ also "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527."  Tr. 16.

As recently explained by a district judge in this District:

> The evaluation of medical opinions for claims filed before March 27, 2017 is governed by 20 C.F.R. § 404.1527, while 20 C.F.R. § 404.1520c governs the evaluation of medical opinions for claims filed on or after that date. The SSA uses "the current rules in all CDRs" unless: (1) it is "the first CDR for the claim(s) after March 27, 2017," *and* (2) there "is no medical improvement

weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016); *accord Kraus*, 988 F.3d at 1024; *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014). "Yet[, this controlling] weight is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted). The opinions of treating physicians "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see, e.g.*, *Koch*, 4 F.4th at 666; *Kraus*, 988 F.3d at 1024-25. When a treating source's opinion is not given controlling weight, the opinion is weighed based on a number of factors, including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. 20 C.F.R. § 404.1527(c); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ is required to "give good reasons" for the weight assigned to a treating

related to the ability to work," *and* (3) "[a]ll full medical determination(s) made in the claim(s) under review were made using the prior rules." SSA, Program Operations Manual System, DI 24503.050 Determining the Filing Date for Evaluating Evidence, TN 3 (02-19) (Apr. 3, 2017), https://secure.ssa.gov/poms. Nsf/lnx/0424503050.

*Bridgette W. v. Kijakazi*, No. 20-cv-0201 (PJS/BRT), 2021 WL 3206847, at *7 n.7 (D. Minn. July 29, 2021). As the ALJ found medical improvement related to Plaintiff's ability to work, Tr. 15, § 404.1520c applies to the evaluation of opinion evidence, not § 404.1527. *Id.* (citing *Bobo v. Saul*, No. 4:19-CV-199 PLC, 2021 WL 2665907, at *5 n.5 (E.D. Mo. June 29, 2021)).

Nevertheless, because the ALJ applied § 404.1527 and neither party has objected to this error, the Court will apply § 404.1527 as well. *Id.* Notably, § 404.1527 "is more deferential to treating physicians, and thus applying it *helps* [Plaintiff]." *Id.* (citing *Burba v. Comm'r of Soc. Sec.*, No. 1:19-CV-905, 2020 WL 5792621, at *4 (N.D. Ohio Sept. 29, 2020) ("[T]he new regulation is supposed to make it easier for ALJs to discount treating physician opinions.")).

source's opinion.  20 C.F.R. § 404.1527(c)(2); *Koch*, 4 F.4th at 666; *Cline*, 771 F.3d at 1103.

Plaintiff highlights the fact that Dr. Van Eck continued to diagnose her as having chronic lower back pain with sciatica.  Pl.'s Mem. at 4.  But, the residual-functional-capacity determination is "an assessment of what [Plaintiff] can and cannot do, not what [s]he does and does not suffer from."  *Mitchell v. Astrue*, 256 F. App'x 770, 772 (6th Cir. 2007).  A diagnosis alone is not sufficient.  *See Perkins v. Astrue*, 648 F.3d 892, 899-900 (8th Cir. 2011).  The fact "[t]hat a claimant has medically documented impairments does not perforce result in a finding of disability."  *Stormo*, 377 F.3d at 807.  Moreover, the ALJ found Plaintiff's ongoing lower back pain related to lumbar degenerative disc disease as well as her "neck, shoulder and upper extremity symptoms associated with cervical degenerative disease" to be severe impairments, Tr. 15, and, as discussed in greater detail below, limited Plaintiff to light work "with only occasional bending, stooping, crouching[,] climbing ramps, stairs and ladders, and reaching overhead" as a result, Tr. 18.

Plaintiff's primary argument is that, by finding Dr. Van Eck's opinion inconsistent with examination findings in the record, the ALJ substituted his own opinion for that of a physician.  According to Plaintiff, the ALJ "is saying that he has a better understanding of the signs and symptoms [Plaintiff] displayed than the doctor actually recording [her] signs and symptoms" and thus "placed his own expertise against that of a trained medical professional."  Pl.'s Mem. at 14.

In determining the weight to apply to opinion evidence, the regulations *require* an ALJ to consider a medical opinion in light of the evidence in the record as a whole. 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."); *see, e.g.*, *Kraus*, 988 F.3d at 1024-25; *Julin*, 826 F.3d at 1088; *Stormo*, 377 F.3d at 806. Plaintiff points to two places in the record where she was observed to have an impaired gait. Pl.'s Mem. at 4 (citing Tr. 595, 642). On these two occasions, Dr. Van Eck observed Plaintiff to be "[w]alking slowly with [a] bent over antalgic gait," Tr. 595, and to have a "[s]tooped, shuffling gait," Tr. 642; *see also* Tr. 456, 591-92 (impaired gate noted during physical therapy). The ALJ correctly observed, however, other "examination findings show[ed a] normal gait with no assistive devices," including Dr. Van Eck's own findings on at least two occasions. *See, e.g.*, Tr. 461 (Dr. Van Eck), 498, 634 (Dr. Van Eck), 762. *See Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008) ("Although Finch's medical records show occasional difficulty with the use of his arms and hands, other medical evidence shows normal grip strength and dexterity. Similar inconsistencies exist with respect to Finch's leg strength and gait.").

Moreover, as the Commissioner points out, the ALJ correctly observed that Dr. Van Eck's opinion was inconsistent with other medical evidence in the record indicating Plaintiff had greater ability to function, including "a normal EMG of the upper extremities, cervical MRI showing only mild to moderate degenerative changes, mildly decreased lumbar and cervical range of motion, and treatment notes indicating that [Plaintiff] has migraine headaches only infrequently." Tr. 19. *See Smith v. Colvin*, 756

F.3d 621, 627 (8th Cir. 2014) ("Here the ALJ gave reasons for giving limited weight to the opinions of Dr. Amison and Dr. Cao, including a lack of substantial support for their opinions from other record evidence and a lack of evidence of clinical and laboratory abnormalities."); *see also Finch*, 547 F.3d at 938.

Plaintiff is essentially advocating that the opinion of a treating physician be given controlling weight merely because it is the opinion of a treating physician, without regard to whether that opinion is otherwise consistent with the record as a whole. *Contra Cline*, 771 F.3d at 1103; *cf. Kraus*, 988 F.3d at 1024 ("An ALJ need not give controlling weight to treating physicians' opinions in all instances. An ALJ may give limited weight if they provide conclusory statements only, or are inconsistent with the record." (quotation omitted)); *Stormo*, 377 F.3d at 805 ("Merely concluding that a particular physician is a treating physician, therefore, is not the end of the inquiry."). Such an argument stands in direct contradiction to the regulations and the governing case law. *See, e.g.*, 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."); *Kraus*, 988 F.3d at 1024-25; *Stormo*, 377 F.3d at 806. Plaintiff has not identified any evidence—medical or otherwise—the ALJ failed to consider when evaluating the consistency of Dr. Van Eck's opinion with the record as a whole. The Court concludes that the ALJ gave good reasons for assigning limited weight to Plaintiff's treating physician. *See Julin*, 826 F.3d at 1088.

### 3.  Dr. Horozaniecki

#### a.    Dr. Horozaniecki's Opinion

At the hearing, the ALJ asked Dr. Horozaniecki to opine on Plaintiff's residual functional capacity.  Tr. 49.  Dr. Horozaniecki testified that

> the medical record would support a light level of exertion, with only occasional bending or stooping, crouching, kneeling, crawling; only occasional overhead reach; no exposure to workplace hazards or unprotected heights; [and] . . . occasional use of ramps—occasional ramps and stairs, and occasional use of ladders.

Tr. 49.  When questioned by Plaintiff's counsel, Dr. Horozaniecki testified that the limitation to occasional overhead reaching accounted for Plaintiff's shoulder impingement, Tr. 50, and he limited Plaintiff to light work on account of her pain, Tr. 51.

#### b.    Weight Accorded to Dr. Horozaniecki

The ALJ gave "great weight" to Dr. Horozaniecki's opinion, finding it "consistent with the medical evidence . . . showing normal gait, normal strength in the extremities, and mildly decreased range of motion in the neck and low back."  Tr. 19.  Plaintiff contends that the ALJ improperly relied on Dr. Horozaniecki's opinion when determining Plaintiff's residual functional capacity because the opinions of non-treating, non-examining physicians "do not normally constitute substantial evidence on the record as a whole."  Pl.'s Mem. at 13.

Plaintiff is correct that, as a general matter, such opinions "do not normally constitute substantial evidence on the record as a whole."  *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) (quotation omitted); *see* 20 C.F.R.  §  404.1527(c)(1)

(examining relationship), (2) (treatment relationship); *see also Kraus*, 988 F.3d at 1025

("Generally, treating physicians' opinions should be given greater weight than opinions

from consultants who have never met the claimant and base their opinions solely on the

record." (quotation omitted)).  Nevertheless, under the regulations, the ALJ is required to

"evaluate every medical opinion."   20 C.F.R. § 404.1527(c); *see* 20 C.F.R.

§ 404.1513a(b)(2) ("Administrative law judges may also ask for medical evidence from

expert medical sources.").  Aside from her complaint that Dr. Horozaniecki did not treat

or examine her, Plaintiff does not take issue with the ALJ's conclusion that Dr.

Horozaniecki's opinion was more consistent with the medical evidence.  Again, the more

consistent an opinion is with the record as a whole, the more weight it will be given.   20

C.F.R. § 404.1527(c)(4).  The ALJ properly gave more weight to Dr. Horozaniecki's

opinion because it was more consistent with other evidence.

### 4.  Residual Functional Capacity Supported by Substantial Evidence on the Record as a Whole

By framing the ALJ's assessment of her residual functional capacity in terms of

the dueling opinions of Drs. Van Eck and Horozaniecki, Plaintiff takes too narrow a view

of this multi-faceted administrative determination.  *See* 20 C.F.R. § 404.1546(c); *Perks*,

687 F.3d at 1092.  True, the assessment of a claimant's residual functional capacity "must

be supported by some medical evidence of the claimant's ability to function in the

workplace." *Perks*, 687 F.3d at 1092 (quotation omitted).  But, "there is no requirement

that [a residual-functional-capacity] finding be supported by a specific medical opinion"

*Hensely v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  And, as previously stated, it is

ultimately "based on all of the relevant medical and other evidence."   20 C.F.R.

§ 404.1545(a)(3); *see, e.g.*, *Myers*, 721 F.3d at 527; *Perks*, 687 F.3d at 1092.

Here, the ALJ considered all of the relevant evidence in determining Plaintiff had

the residual functional capacity to perform light work with occasional bending, stooping,

crouching, climbing ramps/stairs/ladders, and reaching overhead that did not involve

unprotected heights or "dangerous, exposed moving machinery."   Tr. 15.   The ALJ

summarized the medical records, noting that the "[f]indings on physical examinations

showed improvement."   Tr. 17.   The ALJ pointed out that Plaintiff had "a normal gait"

and "normal strength, sensation and reflexes in the upper and lower extremities on almost

every examination."   Tr. 17.   The ALJ also pointed to medical evidence that Plaintiff's

"lumbar spine range of motion is described as good or slightly limited, despite her history

of L5-S1 fusion."   Tr. 17.   The ALJ discussed how the EMG of Plaintiff's "upper

extremities did not show any evidence of neuropathy or radiculopathy."   Tr. 17.   The ALJ

also discussed the imaging of Plaintiff's spine, including the near resolution of "a

previously seen central disk protrusion at L4-5" and the presence of degenerative changes

in her cervical spine.   Tr. 17.   Additionally, the ALJ cited Dr. Belle Isle's notation that

Plaintiff's "cervical degenerative changes likely contributed to her neck and upper

extremity systems, and that the lumbar examination suggested facet joint related pain

above her fusion."   Tr. 18.   Further, the ALJ cited treatment notes indicating that, while

Plaintiff "had palpable spasm in the right cervical paraspinal muscles," she "had only

mildly decreased range of motion in the neck, normal gait, was able to flex her lumbar

spine more than 90 degrees, had negative straight leg raising[,] and was able to move

about the exam room without difficulty." Tr. 18. Lastly, the ALJ discussed the infrequent notations related to migraine headaches. Tr. 18.

The ALJ explained that Plaintiff's "cervical and lumbar degenerative disease[;] low back, neck and upper extremity pain with normal strength in her upper and lower extremities[;] and slightly decreased lumbar and cervical range of motion support the limitation to light exertion work, with only occasional bending, stooping, crouching[,] climbing ramps, stairs and ladders, and reaching overhead." Tr. 18. The ALJ additionally explained that Plaintiff's "migraine disorder and use of narcotic pain medications are consistent with environmental limitations to no work at unprotected heights or around exposed moving machinery." Tr. 18. Plaintiff has not asserted that the ALJ erred in the consideration of the medical evidence.

The ALJ also properly looked beyond the medical evidence, considering, among other things, Plaintiff's testimony at the hearing, including the pain she experiences, as well as her daily activities. Tr. 16, 18; *see, e.g.*, Tr. 42-44. The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the objective medical evidence and other evidence" in the record. Tr. 17. The ALJ noted that while Plaintiff, her family, and a friend "indicated that [Plaintiff] spends much of her time in bed and required assistance with personal care and all household chores," Plaintiff "reported to the consulting psychologist that she is able to cook, did not have problems performing personal care, and was able to drive." Tr. 18; *compare, e.g.*, Tr. 181-82 *with* Tr. 512. Similarly, while Plaintiff "testified that she has problems focusing," she "reported to the consulting

psychologist that she likes to do Sudoku puzzles, and plays games." Tr. 18; *compare, e.g.*, Tr. 47 *with* Tr. 512. Plaintiff has not challenged the ALJ's evaluation of the intensity, persistence, and limiting effects of her symptoms.

In addition to the medical records, Plaintiff's own statements, and the observations of others, the ALJ properly considered the opinion evidence. The ALJ considered not only the opinions of Drs. Van Eck and Horozaniecki, but also the opinions of the state agency medical consultants. *See* 20 C.F.R. § 404.1513a(b)(1) (ALJ required to consider opinions of state agency medical consultants as such "consultants are highly qualified and experts in Social Security disability evaluation"). The opinions of Dr. Horozaniecki and the state agency medical consultants were generally consistent with one another, all concluding that Plaintiff was capable of performing light work. *Compare* Tr. 49 *with* Tr. 69, 602. There were some differences in postural limitations.[8] One state agency medical consultant opined that Plaintiff could frequently climb ramps and stairs, but never climb ladders. Tr. 69. Dr. Horozaniecki and another state agency medical consultant opined that Plaintiff could do these activities occasionally. Tr. 49, 603. The ALJ explained that, while he gave "substantial weight" to the opinions of the state agency medical consultants, he gave "greater weight to Dr. Horozaniecki's postural limitations" because "his opinion is based on a review of the entire medical record, including treatment after June 2017, evidence not considered by the state agency physicians." Tr. 19. Plaintiff likewise has not challenged the ALJ's evaluation of this opinion evidence.

---

[8] There was also a difference in manipulative limitations. One state agency medical consultant opined that Plaintiff had no manipulative limitations. Tr. 70. Dr. Horozaniecki and another state agency medical consultant opined that Plaintiff should be limited to occasional reaching overhead. Tr. 49, 604. The ALJ included a limitation for occasional overhead reaching consistent with the latter two opinions.

As stated above, the ALJ gave a good reasons for giving little weight to the greater limitations opined by Dr. Van Eck. The ALJ supported the determination of Plaintiff's residual functional capacity with medical findings in the record that were inconsistent with the degree of limitation opined by Dr. Van Eck as well as the opinions of Dr. Horozaniecki and the state agency medical consultants, which all concluded that Plaintiff had a greater ability to function than Dr. Van Eck. The residual-functional-capacity determination was also supported, albeit to a lesser degree, by Dr. Van Eck's opinion as she too opined that Plaintiff should avoid unprotected heights and dangerous machinery. The ALJ did not impermissibly substitute his own opinion for the opinion of a physician or "simply draw his own inferences about [P]laintiff's functional ability from [the] medical reports." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017). It was for the ALJ in the first instance to weigh the conflicting medical opinions alongside the other evidence in the record. *See Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009) ("The ALJ must resolve conflicts among the various opinions."); *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." (quotation omitted)). The Court concludes that the ALJ's residual-functional-capacity determination is supported by substantial evidence in the record as a whole.[9] *See Julin*, 826 F.3d at 1089.

---

[9] Plaintiff also argues that "the testimony of the vocational expert does not constitute substantial evidence on which to base a denial of [her] claim for benefits." Pl.'s Mem. at 15. Plaintiff's argument is grounded in her contention that the ALJ erred in determining her residual functional capacity. "A hypothetical question is sufficient if it sets

## IV. ORDER

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY**

**ORDERED** that:

1. Plaintiff's Motion for Summary Judgement, ECF No. 23, is **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 25, is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September____29____, 2021                    _____*s/ Tony N. Leung*_____
                                                    Tony N. Leung
                                                    United States Magistrate Judge
                                                    District of Minnesota

                                                    *Tonia M. M. v. Kijakazi*
                                                    Case No. 20-cv-774 (TNL)

---

forth the impairments which are accepted as true by the ALJ." *Kraus*, 988 F.3d at 1026 (quotation omitted); *see Perkins*, 648 F.3d at 901-02 ("A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." (quotation omitted)). "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Perkins*, 648 F.3d at 902 (quotation omitted).

    The ALJ was not required to include the limitations identified by Dr. Van Eck "in the hypothetical that he found to be unsupported in the record." *Id.* The ALJ's hypothetical included the "limitations he found to be supported by the evidence as a whole." *Id.* *See* Tr. 53-54. Because the hypothetical was proper, the vocational expert's testimony identifying jobs available to such a person "constituted substantial evidence supporting the . . . denial of benefits." *Renstrom v. Astrue*, 680 F.3d 1057, 1067-68 (8th Cir. 2012) (quotation omitted); *see Swedberg v. Saul*, 991 F.3d 902, 906 (8th Cir. 2021) ("Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." (quotation omitted)).